**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Kelvin HASTING, Gable Gibson, Napoleon Stewart, Gregory Williams, and Kevin Wendall Anderson, Defendants-Appellants.**

Nos. 80–1224, 80–1225, 80–1246, 80–1247, and 80–1398.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1984.

Decided July 26, 1984.

As Amended Aug. 1, 1984.

John F. De Pue, Washington, D.C., for plaintiff-appellee.

Paul Esposito, Lewis, Overbeck & Furman, Chicago, Ill., William L. Gagen, Belleville, Ill., for defendants-appellants.

Before CUMMINGS, Chief Judge, FLAUM, Circuit Judge, and PARSONS, Senior District Judge.[*]

On Remand From the United States
Supreme Court, No. 81-1463

FLAUM, Circuit Judge.

This appeal comes to us in an unusual procedural posture. The defendants were convicted in 1980 of three federal offenses: kidnapping in violation of 18 U.S.C. § 1201(a)(1); transporting women across state lines for immoral purposes in violation of the Mann Act, 18 U.S.C. § 2421; and conspiracy to commit the foregoing offenses in violation of 18 U.S.C. § 371. This court reversed the convictions in 1981 on the basis of the prosecutor's impermissible allusion, during closing argument, to the defendants' failure to deny raping and kidnapping the victims. *See United States v. Hastings,* 660 F.2d 301 (7th Cir.1981).[1] The United States Supreme Court reversed, holding that this court erred in failing to apply a harmless error analysis to the prosecutor's misconduct. *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983). After reviewing the evidentiary record of the case, the Supreme Court determined that the prosecutor's statements were harmless beyond a reasonable doubt. *Id.* at 1981-82. The Court then remanded the case to this court for consideration of those claims that this court did not address in its prior opinion and that the defendants wished to renew. *See id.* at 1982.

Shortly after the Supreme Court handed down its decision, all the defendants indicated to this court that they wish to press the review of two issues: the trial court's failure to permit the defendants' voir dire regarding racial prejudice and the trial court's failure to sever the trials of the defendants. In addition, defendants Anderson and Gibson[2] raise claims relating to the sufficiency of the evidence, to the rule of lenity, and to the prejudicial effect of the government's closing argument, while defendants Williams and Gibson contend that the victims' emotional outbursts during trial were prejudicial and that the trial court erred in allowing the witnesses to express their testimony in legal conclusions. For

---

[*] The Honorable James B. Parsons, Senior District Judge for the Northern District of Illinois, Eastern Division, is sitting by designation.

1. Our earlier opinion incorrectly referred to defendant Hasting as "Hastings."

2. Defendant Gibson, in a status report filed with this court on August 23, 1983, stated that he adopts the positions of all other defendants. We thus understand Gibson to be pressing the additional claims articulated by Anderson and Williams in their status reports.

the reasons discussed below, we affirm the defendants' convictions.

The facts surrounding the crimes in this case are set forth in both the Supreme Court majority opinion and Justice Stevens's concurrence, and we will recount them only briefly. At approximately 2:00 a.m. on October 11, 1979, three young white women and a white man were riding in a car near East St. Louis, Illinois, when a turquoise Cadillac forced them off the road. The occupants of the Cadillac, five black men later identified as the defendants, forcibly removed the women from the car in which they were riding. Two of the defendants immediately raped one of the women and forced her to perform acts of sodomy. The defendants then put the women into the Cadillac and drove them to St. Louis, Missouri, where the defendants repeatedly raped and sodomized the women. At approximately 6:00 a.m., the women were released, and they contacted the St. Louis police. On the basis of the women's descriptions of their attackers and the locations of the sexual attacks, the police arrested the defendants.

## VOIR DIRE

On the first morning of the defendants' trial, the court conducted voir dire of two panels of prospective jurors. Approximately five minutes before the court began the voir dire of the first panel, the defense attorneys handed the court forty-four proposed questions for the prospective jurors. Eighteen of these questions dealt with racial attitudes. The trial court refused to make the requested inquiries regarding race,[3] and it instead asked the group of prospective jurors three questions that were capable of revealing racial bias: one question specifically referred to racial prejudice; one referred to prejudice of any kind; and one referred to the prospective jurors' frame of mind.[4]

Although these three questions did not produce any response from the first panel of prospective jurors, a number of these prospective jurors already had expressed a belief that they would be unable to remain impartial due to either the nature of the crimes or the publicity surrounding the case. During the voir dire of the second panel, the court's specific reference to racial prejudice produced a response from one woman, who indicated that the race of the participants of the trial would affect her verdict.

The defendants argue that, by asking only three general questions that might reveal racial bias and by posing these questions to the prospective jurors as a group, the trial court failed to provide adequate assurances of the impartiality among jury members and failed to elicit sufficient information upon which counsel could exercise their challenges. The government re-

---

**3.** After posing his prepared questions to the prospective jurors of the first panel, the trial court called a sidebar conference with the attorneys of all the parties. During this sidebar, the court asserted that he found the defense counsels' proposed questions to be "largely argumentative" and that many were irrelevant. Stating that the proposed questions would be confusing to the jury, the court accordingly refused to ask them. *See* Trial Tr. at 42.

**4.** The court phrased the questions as follows:
Members of the jury panel, the five defendants here are all black males and all of the complaining witnesses in this case are white females. I am not suggesting by this that any of you have any racial prejudice. However, I call your attention to the fact that if the interracial nature of the participants in this case would have any effect on your verdict, we would like to know about it. In other words, if you tend to believe a person of one race and tend to disbelieve a person of another race

simply because of that person's racial background, I would like to know.
Trial Tr. at 37, 78.
Do you know, ladies and gentlemen, of any reason why you might be prejudiced for or against the government or for or against these defendants or any one of them because of the nature of the charges placed against them or for any other reason whatever?
Trial Tr. at 38, 79.
If you members of this jury panel were on trial here today as these defendants are, or if you were their attorneys charged with the responsibility of representing them and defending them in this case, or if you were the Government charged with the responsibility of prosecuting this case, do you know of any reason why you would not be content to have your case tried by someone that's in the same frame of mind that you're in today?
Trial Tr. at 38, 80.

plies that the trial court's method of conducting voir dire was well within its discretion.

The Supreme Court has indicated that, under its supervisory powers, it would require federal trial courts to make a voir dire inquiry into racial bias in cases involving crimes of interracial violence. In *Rosales-Lopez v. United States*, 451 U.S. 182, 192, 101 S.Ct. 1629, 1636, 68 L.Ed.2d 22 (1981), a plurality of four justices stated that federal trial courts must ask prospective jurors about racial prejudice "when requested by a defendant accused of a violent crime and when the defendant and the victim are members of different racial or ethnic groups." Three dissenting justices asserted that they would require such an inquiry not only when a case involves interracial violence but also whenever the defendant is a member of a racial minority. *See also Ristaino v. Ross*, 424 U.S. 589, 597 n. 9, 96 S.Ct. 1017, 1022 n. 9, 47 L.Ed.2d 258 (1976) (in case involving interracial armed robbery, assault, and battery, voir dire questioning by state court on issue of racial prejudice was not constitutionally required, but Supreme Court would have required such questioning of a federal court faced with same circumstances); *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931) (where facts involved interracial murder, denial of request for inquiry into prospective jurors' racial bias was reversible error). The Supreme Court has never addressed under its supervisory powers the precise form of inquiry into racial bias that is necessary. However, it has stated that federal trial courts have broad discretion, subject to "the essential demands of fairness," in determining voir dire questions. *Aldridge v. United States*, 283 U.S. at 310, 51 S.Ct. at 471. *See also* Fed.R.Crim.Pro. 24(a). A helpful guideline regarding the practical limits of this discretion is found in *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), which involved the application of the fourteenth amendment to state courts, rather than the federal supervisory powers at issue here. In *Ham*, the Court determined that either of two brief, general questions would have been "suffi-cient to focus the attention of prospective jurors on any racial prejudice they might entertain." *Id.* at 527, 93 S.Ct. at 850.

Federal circuit courts similarly have acknowledged that trial courts have wide discretion in formulating voir dire questions relating to racial bias. For example, in *United States v. Grant*, 494 F.2d 120, 122–23 (2d Cir.), *cert. denied*, 419 U.S. 849, 95 S.Ct. 87, 42 L.Ed.2d 79 (1974), the Second Circuit recognized "the trial judge's salutary control of the scope of voir dire," and it expressed its view that possible racial prejudice of prospective jurors can be explored effectively through a "general query whether any juror is unable to judge the case fairly because of the race, creed or color of the defendant." The court further observed that "the trial judge need not ask every question on this subject which the ingenuity of counsel can devise." *Id.* at 122. *Accord United States v. Johnson*, 527 F.2d 1104, 1107 (4th Cir.1975). *See also United States v. Padilla*, 525 F.2d 308, 309 (9th Cir.1975) (trial court acted within its discretion in asking prospective jurors for "yes" or "no" answer as to existence of racial prejudice); *United States v. Robinson*, 466 F.2d 780, 782 (7th Cir.1972) (if trial court finds proposed voir dire question regarding racial bias to be "inartfully phrased," it may rewrite it); *United States v. Scott*, 446 F.2d 509, 510 (9th Cir.1971) (no abuse of discretion found where trial court refused to ask defendant's proposed question about prospective jurors' " 'feelings toward Negroes,' " but nonetheless interrogated prospective jurors upon subject of potential prejudice). In addition, it is within a trial court's discretion to pose questions regarding racial bias to prospective jurors as a group rather than individually. *See United States v. Banks*, 687 F.2d 967, 974, 976 (7th Cir.1982), *cert. denied*, 459 U.S. 1212, 103 S.Ct. 1208–09, 75 L.Ed.2d 448 (1983); *United States v. Dixon*, 596 F.2d 178, 181–82 (7th Cir.1979). *See also United States v. Kibler*, 667 F.2d 452, 455 (4th Cir.), *cert. denied*, 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982) (where race was not a central aspect of the case, trial judge is not required to question prospective jurors individually on the issue of racial prejudice).

This court will not find that a trial court abused its discretion in conducting voir dire where there is "sufficient questioning to produce, in light of the factual situation involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right of challenge." *United States v. Martin*, 507 F.2d 428, 432 (7th Cir.1974) (quoting *United States v. Lewin*, 467 F.2d 1132, 1137 (7th Cir.1972)). *See also United States v. Banks*, 687 F.2d at 974.[5] Under this test and in view of the cases discussed above, we find that the voir dire questioning in the present case was sufficient. The record reflects that the trial court specifically asked the prospective jurors if they felt that the race of the participants at the trial would affect their verdict. We are satisfied that this inquiry, which was similar to the type of question approved in *Grant* and *Johnson*, focused the attention of the jurors on possible racial prejudice. *See Ham v. South Carolina*, 409 U.S. at 527, 93 S.Ct. at 850. This was demonstrated by the candid response of one prospective juror, who expressed her inability to decide the case impartially due to racial bias.

Furthermore, the factual situation surrounding the crimes in this case did not require that the prospective jurors be examined individually. Although the crimes had been reported in the news media, there is no indication that either they or other recent events has sparked racial discord among the local citizenry. This case thus is distinguishable from *United States v. Bear Runner*, 502 F.2d 908 (8th Cir.1974), in which an American Indian stood trial for larceny in the same general locality where the highly publicized events involving American Indians at Wounded Knee had taken place several months before. The Eighth Circuit observed that in the wake of the Wounded Knee incident, "the feelings of the local citizenry ran high," and it ruled that detailed questions directed at the individual prospective jurors were necessary in order to secure a fair and impartial jury. *Id.* at 912–13. Since the record in the present case does not reveal a comparable atmosphere of recognized racial tension, we conclude that the district court's voir dire on the issue of racial bias constituted sufficient questioning to produce some basis for a reasonably knowledgeable exercise of the right to challenge, and thus we find no abuse of discretion.

## SEVERANCE

In their Joint Supplemental Brief, the defendants claim that defendant Williams presented a defense that was antagonistic to the defenses of the other defendants and that the trial court erred in failing to sever their trials due to these antagonistic defenses. In addition, as a separate point, it is contended that defendant Gibson's trial should have been severed from that of defendant Anderson.

### Antagonistic Defenses

According to the defendants, Williams attempted to show at trial that the victims had consented to be transported to St. Louis, while the other defendants only sought to demonstrate to the jury that the government had failed in its burden of identifying the defendants as perpetrators of the crimes. The defendants argue that, since these two defenses were inconsistent, the trial court should have severed the case and each defendant should have been tried separately. In support of their position, the defendants point to the Supreme Court's majority opinion in this case, which observed that the "defense efforts presented patently and totally inconsistent theories." *United States v. Hasting*, 103 S.Ct. at 1982.

At the outset, we note that, prior to the Supreme Court's remand of this case to

---

**5.** For another formulation of this test, see *United States v. Dellinger*, 472 F.2d 340, 367 (7th Cir.1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973), where this court stated that "[t]he focus is exclusively on whether the procedure used for testing impartiality [of prospective jurors] created a reasonable assurance that prejudice would be discovered if present." *See also United States v. Saimiento-Rozo*, 676 F.2d 146, 148 (5th Cir.1982); *United States v. Brooks*, 670 F.2d 148, 152 (11th Cir.), *cert. denied*, 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1339 (1982); *United States v. Patterson*, 648 F.2d 625, 630 (9th Cir.1981).

this court, the defendants had never raised the argument of antagonistic defenses.[6] We thus are doubtful that the defendants properly preserved this point for our consideration. Even if the point is properly before us, however, we find that the defenses presented in this case were not mutually antagonistic so as to require severance.

■ It is settled in this circuit that "[m]utually antagonistic defenses mandate severance only when acceptance of one party's defense precludes the acquittal of the other." *United States v. Banks*, 687 F.2d 967, 973 (7th Cir.1982). *See also United States v. Ziperstein*, 601 F.2d 281, 285 (7th Cir.1979), *cert. denied*, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980). In the present case, it is clear that the trial strategy of all the defendants was solely to discredit the testimony of the government's witnesses. Defendants Williams, Anderson, and Hasting called witnesses to show that their physical appearance on the evening of the crimes conflicted with the descriptions given by the victims. During closing arguments, all the defense attorneys asserted that the government witnesses had not identified their clients clearly and accurately. In addition, defendants Williams and Gibson presented witnesses whose testimony suggested that, contrary to the assertions of the government witnesses, the victims were willing participants in the events that occurred to them. The notion of willing participation was repeated during closing arguments, when attorneys for defendants Stewart, Williams, Gibson, and Hasting referred to testimony from which inferences could be drawn that the victims' car had not been forced off the road and that the victims had not intended to return directly home on the night of the crimes. At no time during the trial did the defense attorneys present evidence or argue to the jury that any of the defendants were involved in the events surrounding the crimes. Thus, to the extent that Williams or any other defendant attempted to

discredit the victims' story of forcible kidnapping, we hold that the jury's acceptance of this defense with regard to one defendant could not have precluded the acquittal of the other defendants. Severance therefore was not mandated by mutually antagonistic defenses.

*Severance of Gibson from Anderson*

■ During trial, defendant Anderson introduced into evidence a photograph of a police lineup in which both Anderson and Gibson appeared. Two witnesses, a police officer and the male companion of the victims, identified Gibson in the photograph while they testified before the jury. In the defendants' joint brief to this court, it is argued that Gibson's arrest violated the dictates of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and that Gibson's appearance in the lineup was a fruit of this illegal arrest. Thus, according to this argument, the photograph of the lineup, while admissible as to Anderson, was inadmissible as to Gibson, and the failure to sever the trials of these two defendants led to prejudicial identification of Gibson during trial.

We need not determine the legality of Gibson's arrest in light of *Payton*, for it is clear from the Supreme Court's review of the record in this case that any prejudice to Gibson resulting from the introduction of the photograph at trial was minimal. The Court stated that the testimony of the three victims, "who described in detail the repeated wanton acts of the defendants during three hours in two states, ... negat[ed] any doubt as to identification." *United States v. Hasting*, 103 S.Ct. at 1981. Thus, the substantial identification testimony provided by the three victims rendered harmless any error in the trial court's failure to sever Gibson's trial from that of Anderson. *See United States v. Ong*, 541 F.2d 331, 338 (2d Cir.1976), *cert. denied*, 430 U.S. 934, 97 S.Ct. 1559, 51 L.Ed.2d 780 (1977) (even though certain evidence concerning codefendants probably would not have been admissible against

---

**6.** Indeed, at oral argument, one of the defense counsel admitted that the only reason the defendants are now arguing that Williams's de-

fense was antagonistic is because the Supreme Court noticed inconsistencies in the defense theories.

defendant alone, trial court's error in failing to sever was rendered harmless by substantial evidence of defendant's guilt). Moreover, any objections that the victims' in-court identifications of Gibson were fruit of the alleged *Payton* violation would not have been remedied by severance.[7]

We have carefully considered the defendants' remaining claims, and we conclude that they are without merit. Accordingly, we affirm the defendants' convictions.

---

7. In his brief filed prior to this court's first decision in this case, defendant Gibson argued that the victims' in-court identifications of Gibson were tainted by the alleged illegal arrest. Although in his status report, *see supra* note 2, Gibson did not specifically identify this claim as one that he wished to renew, we have considered this question, and we find it to be without merit. In *Crews v. United States,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), the Supreme Court identified three elements of a victim's in-court identification of an accused: the victim's presence at trial to testify about the events surrounding the crime and to identify the defendant; the victim's ability to reconstruct the prior criminal occurrence and to identify the defendant from observations made at the time of the crime; and the defendant's physical presence in the courtroom for the victim's observation during trial. *Id.* at 471, 100 S.Ct. at 1249. If the first two elements were not attained by exploiting the accused's fourth amendment rights, the in-court identification is admissible. *Id.* The third element, the defendant's presence in the courtroom, is not affected by the legality of the defendant's arrest. *Id.* at 477–79, 100 S.Ct. at 1253–54 (five justices agree that "a defendant's face" cannot be suppressible as a fruit of an unlawful arrest). In the present case, it is clear from the record that neither the victims' presence at trial nor the victims' ability to reconstruct the events of the crimes were attained by any violation of Gibson's rights that might have occurred during his arrest. The victims' in-court identifications were therefore admissible as to Gibson.